FREEMAN GRAVES, RESPONDENT, v. MERCHANTS AND MECHANICS MUTUAL FIRE INSURANCE COMPANY, A CORPORATION, APPELLANT.—139 S. W. (2d) 1040.

St. Louis Court of Appeals. Opinion filed May 7, 1940.

544

*C. P. Damron* and *A. M. Spradling* for respondent.

*Jack O. Knehans* and *Oscar A. Knehans* for appellant.

McCULLEN, J.—This suit was brought by respondent, as plaintiff below, to recover from appellant, as defendant, for services alleged to have been rendered by plaintiff to defendant. A trial before the court and a jury resulted in a verdict and judgment for $500 in favor of plaintiff. After an unavailing motion for a new trial, defendant appealed.

Plaintiff's amended petition was in two counts. The first count alleged that, on September 25, 1932, defendant carried fire insurance on the property of one William R. Rea & Sons in Bollinger County, Missouri, in the sum of $3,000; that on said date, while said insurance was in effect, said property was destroyed by fire; that defendant desired to ascertain the origin of said fire, and to that end on October 19, 1932, entered into a written contract with plaintiff to investigate said fire; that by said contract it was agreed that plaintiff should have

ninety days from date thereof in which to perform same, and if, as a result of his work, it was found that the fire was of incendiary origin and defendant was relieved of paying said Rea & Sons said insurance, defendant would pay plaintiff $500 for his services, otherwise plaintiff should be paid nothing for his services.

The first count further alleged that plaintiff immediately entered upon the duties of his said employment, but, before the expiration of the contract, it was mutually agreed between plaintiff and defendant that, in consideration of plaintiff continuing his investigation, plaintiff should have such additional time to complete his duties under the contract as to him seemed reasonably necessary; that plaintiff thereafter continued to discharge his duties under the contract, and while so doing and prior to the expiration thereof, without fault on the plaintiff's part, defendant notified plaintiff that it intended to settle its losses under said policy for a nominal sum, and that plaintiff's services were no longer needed; that defendant did settle its losses for a nominal sum and thereby prevented plaintiff from duly completing his contract, to plaintiff's damage in the sum of $500, for which amount plaintiff prayed judgment.

The second count was in *quantum meruit*. It contained the same general allegations as in the first count with respect to the making of the contract, the purpose thereof, performance of duties by plaintiff thereunder, the mutual extension of the time thereof for performance, and the prevention by defendant of plaintiff's full performance, and concluded with the allegation that the reasonable value of plaintiff's work and services which he performed for defendant and which were utilized by defendant was $500, for which amount plaintiff prayed judgment.

Defendant's answer to the first count of plaintiff's amended petition admitted that defendant entered into the written contract with plaintiff as alleged in plaintiff's amended petition, but denied that plaintiff immediately entered upon the duties of his employment; denied that plaintiff performed said duties, or any of them; denied that, before the expiration of the contract, it was agreed that plaintiff should have additional time to complete his duties thereunder; denied that plaintiff was discharged by defendant without just cause; and denied that defendant prevented plaintiff from completing the performance of his duties under said contract. Defendant alleged in its answer to the first count of plaintiff's amended petition that it was not determined within ninety days of said contract that said fire was of incendiary origin; that it was never so determined; that defendant was not relieved of paying the insurance mentioned therein, but was compelled to pay a large sum of money to the insured on account of said fire losses; that, under the terms of said written contract, defendant owes plaintiff nothing.

Defendant's answer to the second count contained denials and allegations similar to those in the answer to the first count, and further alleged that plaintiff operated under the written contract, which is set out in full by defendant in its answer to the second count. The answer concludes with allegations that defendant did not utilize or use any of plaintiff's services or work; that plaintiff's services were of no assistance and of no value to defendant in avoiding payment of said insurance or in effecting any compromise in the payment thereof.

Plaintiff's replies to the answers to both counts were general denials.

At the close of plaintiff's evidence, the court, at the request of defendant, gave the jury a peremptory instruction to find a verdict for defendant on the first count. At the close of all the evidence, the cause was submitted to the jury on the second count based upon the reasonable value of plaintiff's services, resulting, as heretofore stated, in a verdict for plaintiff in the sum of $500.

Plaintiff testified that after he was employed by defendant he interviewed a number of persons as to their knowledge or information concerning the fires; that he made a trip from his home near Marble Hill, Missouri, to Jefferson City, Missouri, where he interviewed Lester Reed who was then a prisoner in the Missouri State Penitentiary; that about a month prior to the fires he and the Sheriff of Bollinger County had taken Reed to the penitentiary as a prisoner, and on that trip Reed told plaintiff that William Rea had offered him $10 to burn the building, saying that he was in debt and could not get out of debt unless he collected the insurance on the property. Plaintiff further testified that he tried to get Reed to make a written statement of those facts but that Reed refused because he thought the prisoners would consider him a snitch, but that he told plaintiff he would testify in court concerning the conversation he had had with Rea about burning the property.

Lester Reed testified that he lived in Bollinger County, Missouri, and in 1932 was convicted of a crime there; that he knew Mr. Rea and his sons and where they lived; that the Reas conducted a filling station and store combined, and that there was a dwelling house behind the filling station; that before he was sent to Jefferson City he had a conversation with the Reas in front of the filling station. The first conversation was with William R. Rea, the father of Glenn H. and Paul Rea; that Mr. Rea told him he was in debt on the property and he would like to get witness to help him out; that witness asked Mr. Rea in what way he could help him out, and Mr. Rea answered: "Well, if it would burn I could get the insurance;" that Mr. Rea said he would give him $10. The witness further testified that he later had a conversation with Glenn Rea who asked him if he was going to take the $10 Glenn's dad had offered him; that he told Glenn Rea he didn't need it; that both conversations occurred before the fire; that when he was taken to Jefferson City by Dorman Elledge, the

Sheriff, and plaintiff, he related these conversations to plaintiff; that plaintiff again saw witness at Jefferson City, but he told plaintiff he would do nothing about the matter until he got out of the penitentiary.

It appears that plaintiff also interviewed Pleas Vance, who lived near the Rea Filling station and home at the time of the fires. Mr. Vance testified, as a witness at the trial, as to the information he had given plaintiff while plaintiff was investigating the origin of the fires. Said information and testimony were to the effect that witness was at the filling station on many occasions prior to the fires and noticed that the store of merchandise gradually diminished and that the Reas "had nothing there just before the fire;" that shortly before the fire they had taken a rifle and guitar away from the place; that he was at the Rea's place about twelve o'clock the night of the fires, and when he went home and looked up he saw the "flare" and went back and both buildings were then on fire; that the fires were in the back part of each building, burning toward the fronts.

It further appears from the evidence that plaintiff, in conducting his investigation, interviewed Sherman McGee, who lived near the Reas at the time of the fires. Mr. McGee was called as a witness for plaintiff at the trial and testified that after the fires he talked to plaintiff and told plaintiff "what I am testifying to today;" that plaintiff made a trip out to his house to interview the witness. Mr. McGee's testimony as to the information he gave to plaintiff was to the effect that he, the witness, was at the Rea's filling station from about ten to eleven o'clock the night of the fires; that he noticed a difference about the contents of the filling station; that there was scarcely anything in there; that he saw the two Rea sons but not the father that night; that the sons were dressed in everyday work clothes; that he went home about eleven o'clock and afterwards his attention was attracted by the fires and he returned to the Rea place and found both buildings were burning. The fires looked about alike, looked like they caught fire at the same time, both burning alike. Each one had consumed the same amount of the building; that he saw the two sons there at that time; that they had on their good suits of clothes; that there was no fire in the east rooms of the buildings when he returned, and the two Rea sons could have removed things from the dwelling with safety after the witness returned, but they did nothing about it; that plaintiff interviewed witness about the fires and that witness believed that he was also interviewed by Mr. Gladish, who was then treasurer of the defendant company; that he gave both plaintiff and Mr. Gladish the information covered by his testimony at the trial.

Plaintiff testified that during the time he was conducting the investigation of the fires, he made occasional reports to Mr. Manning and Mr. Keller of the defendant company; that he believed he went to defendant's office in Cape Girardeau and talked to defendant's officers about these matters during the time he was conducting the

investigation; that he made a written report dated January 16, 1933, of the results of his investigation. This report was introduced in evidence as plaintiff's Exhibit C. The report is in separate paragraphs numbered from one to seven and contains a resume of the results of plaintiff's investigation of the fires. Plaintiff also introduced in evidence his Exhibit B, which is a letter dated January 14, 1933, to plaintiff from the defendant company requesting plaintiff to make a typed list showing all the information he had obtained up to that time "to be used in the William Rea case." The written report of plaintiff to defendant company was made in response to said letter from defendant.

The ninety-day-period provided for in the written contract for plaintiff's conduct of the investigation expired January 17, 1933. It will be noted that defendant wrote plaintiff asking for the written report on January 14, 1933, and that plaintiff's report in answer to that request was dated January 16, 1933. The evidence shows that it was received by defendant on the same day. On January 18, 1933, defendant notified plaintiff that it had decided on February 1, 1933, as a date for a meeting at its office in Cape Girardeau to take up the matter of the fires. The evidence shows that on February 1, 1933, plaintiff, Mr. Rea (the insured), Mr. Keller and Mr. Gladish, officers of defendant company, and Mr. Smith, attorney for defendant, met at defendant's office in Cape Girardeau; that plaintiff then went over his report with defendant's officers and the attorney, and at that time gave them the names of witnesses by whom proof could be made of the various items in plaintiff's report. By prearrangement, Mr. Rea was then called into the conference and was confronted by plaintiff and the information plaintiff had procured. This was gone over item by item. Mr. Rea denied everything and finally left the conference. After he had gone, Mr. Keller proposed to pay Rea $200 to settle the fire losses. There is testimony showing that plaintiff objected to any such settlement being made, saying to Mr. Keller, "Let him go. He ain't going to sue anybody;" and that Mr. Smith, defendant's attorney, said "Just let him alone," after which the meeting adjourned.

It further appears from the evidence that later on, at Mr. Manning's office, defendant's officers told plaintiff that if they settled with Mr. Rea for a little something, they would pay plaintiff. Thereafter plaintiff heard that defendant had settled with Mr. Rea for $100 for his fire losses, whereupon plaintiff went to Cape Girardeau and asked Mr. Keller about it. Mr. Keller said, "Yes, I did give him $100 and he turned the policy over to me and signed a release that he had no comeback." Plaintiff then asked Mr. Keller about payment for his services, but Mr. Keller said, "No. We have settled with Rea and we are not going to pay you." On this point plaintiff testified that Mr. Keller said the defendant might give him something for gas

and oil, or might give him twenty-five dollars; that he told Mr. Keller: "You don't owe me twenty-five dollars; if you don't owe me five hundred dollars, you don't owe me anything."

It appears from the evidence, without dispute, that defendant did settle the claim of William Rea on the policy, the face amount of which was for $1800, by paying William Rea $100; and that it also settled the claims of Glenn Rea and Paul Rea against it for $1200 by giving them its promissory note for $1200, which it afterwards paid to L. F. Popp, who had purchased it from Glenn and Paul Rea.

Defendant contends that a count based on an expressed written contract cannot be joined with a count based on *quantum meruit*; and that the court erred in overruling defendant's motions to compel plaintiff to elect between count one and count two of his petition. We must rule this point against defendant. It has been definitely decided by our Supreme Court that a count on contract and one on *quantum meruit* may be joined under the statute which is now section 765, Revised Statutes of Missouri, 1929 (Mo. Stat. Ann., sec. 765, p. 992). [Williams v. Chicago, S. F. & C. Ry. Co., 112 Mo. 463, 20 S. W. 631; Moore v. Gaus & Son Mfg. Co., 113 Mo. 98, 107, 20 S. W. 975; Sims v. Spelman, 209 Mo. App. 186, 232 S. W. 1071; Phillips v. Geiser Mfg. Co., 129 Mo. App. 396, 107 S. W. 471.] While it was formerly held that an action on contract and one on *quantum meruit* should not be joined in the same petition, the Supreme Court, in Williams v. Chicago, S. F. & C. Ry. Co., and Moore v. Gaus & Son Mfg. Co., *supra,* overruled such former holdings and held that it is proper to unite them in separate counts in the same petition. [See also 21 R. C. L., sec. 35, p. 470.]

The court's refusal to require plaintiff to elect at the beginning of the trial was not reversible error. The trial court itself later on made an election by taking the first count away from the jury. The evidence adduced was the same as to both counts and was admissible on both counts, hence defendant's rights cannot be said to have been prejudiced by the court's action.

Defendant next contends that the parties having put their contract in writing, it is conclusively presumed that the whole engagement was contained therein, and, citing cases in support of said principle of law, argues that the court erred in admitting testimony as to the extension of time for performance of the contract by plaintiff because it was evidence of a contemporaneous or prior parol agreement contrary to the terms of the written instrument. There can be no doubt as to the correctness of the principle of law stated by defendant, but, under the evidence in this case, it is not applicable. The parol agreement referred to was not made prior to or contemporaneously with the written contract but was made after the contract was made and after plaintiff entered upon the performance of his duties thereunder. In this connection, plaintiff at first testified that the question of the

ninety-day-period named in the contract came up at the time. the contract was made; but he further testified that, after the contract was made and after he had received it, he had a conversation with Mr. Keller, secretary of defendant company, at the office of Mr. Manning who was at that time writing applications for insurance for defendant. Referring to his conversation with Mr. Keller at that time, plaintiff testified: "Mr. Keller came over there to Mr. Manning's office and we were talking about the work; I told him I liked the contract all right with the exception I might not have enough time; he said 'You go ahead, we can give you all the time you want.' "

Mr. Manning, called as a witness for plaintiff, corroborated plaintiff's testimony in this respect as follows:

"Q. Tell what was said by Mr. Keller, if anything, about extending the contract and giving Graves more time. A. Mr. Keller told Mr. Graves to go ahead, it didn't make any difference about the time, or words meaning the same thing."

Defendant concedes that parties may, by a subsequent parol agreement upon a sufficient consideration, change or alter the terms of their written agreement, but contends that there was no consideration for the new parol agreement in this case extending the time for plaintiff's services beyond the time specified in the written contract. We think the promise of plaintiff to continue his services beyond the time specified in the written contract was a sufficient consideration for defendant's agreement to extend the time for performance thereof. The contract had not been fully performed by plaintiff at the time it was verbally agreed that he should have further time. It has been held that the substitution of a new contract for an old contract while still unperformed is a sufficient consideration for the new contract. [State ex rel. Presnell v. Cox et al. (Mo.), 250 S. W. 374, 376. See also 17 C. J. S., sec. 373, p. 857.]

Defendant argues that, if a contract is admitted or proved, the right to recover will be governed by it, and where a party fails to perform the services provided for in the contract, he is not entitled to any compensation whatever unless his failure is caused by the unwarranted interference of the other party. As an abstract statement of a legal principle, such argument is correct, but plaintiff's evidence in this case was to the effect that there was interference by defendant with plaintiff's completion of his contract. Under such evidence, if believed, it is assumed that the services would have been fully performed but for such interference. [Reynolds v. Clark, 162 Mo. 680. 684, 63 S. W. 382.]

Defendant contends that the court erred in giving to the jury Instruction No. 1 because, as defendant claims, there was no evidence of the reasonable value of plaintiff's services. Plaintiff was entitled to recover the reasonable value of his services but not more than the amount named in the contract. [Aldridge v. Shelton's Estate

(Mo. App.), 86 S. W. (2d) 395, 398.] The contract itself was set forth *in haec verba* in defendant's answer. Its terms and conditions were not disputed. It alone constituted *prima facie* evidence of the reasonable value of plaintiff's services. [American Surety Co. v. Fruin-Bambrick Const., Co., 182 Mo. App. 667, 673, 166 S. W. 333.]

Defendant next contends that the instruction was erroneous because it authorized a verdict for plaintiff on *quantum meruit* whereas the contract provided that plaintiff was to receive nothing for his services unless a certain result was obtained. Such argument completely ignores the evidence of plaintiff that full performance of the contract was prevented by defendant's interference. Defendant voluntarily chose to make a compromise settlement with the Reas notwithstanding the important information which plaitniff's investigation had disclosed tending to show the incendiary origin of the fires which destroyed the insured property. As shown by their verdict, the jury evidently chose to believe that plaintiff's investigation and the important information which defendant thereby obtained enabled defendant to settle claims of the face value of $3000 by paying only $1300, and chose to disbelieve defendant's assertions that plaintiff's services were of no value whatever. The instruction complained of is lengthy. We deem it unnecessary to set it forth here. It is sufficient to say that it was within the pleadings and was based upon the evidence. We find nothing therein which would justify a reversal of the judgment.

Other points made by defendant are so connected and interwoven with those heretofore discussed that they are necessarily disposed of by what we have already said. No useful purpose would be served by prolonging this opinion to discuss them separately.

We find no reversible error in the matters complained of and the judgment is accordingly affirmed. *Hughes, P. J.,* and *Becker, J.,* concur.